UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Mack Industries, Ltd., et al., | ) | |
| | ) | No. 17 B 09308 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| Ronald R. Peterson, as Chapter 7 Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 A 00522 |
| | ) | |
| TTS Granite Inc., | ) | |
| | ) | |
| Defendant. | ) | Judge Carol A. Doyle |

**Memorandum Opinion**

Chapter 7 trustee Ronald Peterson filed this adversary proceeding against defendant TTS Granite Inc. ("TTS") seeking to recover alleged fraudulent transfers made to it by debtor Mack Industries Ltd. ("Mack"). The trustee alleges that Mack ordered granite counter tops from TTS and paid for them but had them installed in properties that Mack did not own. He contends that these transfers were part of a fraudulent scheme to deplete Mack's assets.

TTS moved to dismiss the amended complaint. It argues that the trustee has not alleged a plausible claim for fraudulent transfer based on either constructive fraud or actual fraud. TTS is correct regarding the claim based on constructive fraud, which will be dismissed. TTS's motion

1

to dismiss the claim based on actual fraud will be denied.

1.      Background and Amended Complaint

The trustee filed a complaint against TTS alleging two claims to avoid fraudulent transfers. The court granted a motion to dismiss a similar adversary proceeding in *Peterson v. McClean (In re Mack Industries, Ltd.)*, No. 19-ap-00433, 2019 Bankr LEXIS 3603 (Bankr. N.D. Ill. Nov. 20, 2019). The complaint in this case was very similar to the complaint in *McClean*. The trustee consented to the dismissal of his complaint against TTS. He was granted leave to amend and he filed the amended complaint. TTS now moves to dismiss the amended complaint.

In the amended complaint, the trustee again alleges two claims for fraudulent transfer. He seeks to recover payments of approximately $317,000 that Mack made to TTS between September 2013 and March 2015. Exhibit A to the amended complaint contains a list of transfers totaling $391,000. Approximately $74,000 of the payments were for granite installed in properties owned by Mack or one of Mack's unsecured creditors, American Residential Leasing Company LLC. The trustee does not seek to recover those payments. The trustee alleges that the remaining $317,000 in payments were for granite fabricated and installed by TTS in properties owned by parties other than Mack or American Residential.

In Count I, the trustee alleges that the $317,000 in payments were constructively fraudulent under the Illinois Uniform Fraudulent Transfer Act and § 548(a)(1)(B) of the Bankruptcy Code. He contends that the granite was installed in properties owned by third parties and therefore provided no value to Mack. In Count II, the trustee alleges that Mack made the payments with actual intent to defraud. He bases this claim primarily on a statement allegedly

made by a vice president of Mack in June 2014 threatening American Residential that if it did not renegotiate a significant contract, Mack would dissipate its assets to prevent American Residential from collecting from it.

The amended complaint alleges as follows regarding the actual fraud claim in Count II. Mack's primary business was "flipping houses" - buying properties, improving them, and selling or renting them. Amended Complaint ¶ 8. American Residential purchased hundreds of properties from Mack, which then leased the properties back from American Residential under a Master Lease Agreement ("Agreement") and sublet them to tenants. In the summer of 2014, Mack began to claim that it could not meet its obligations under the Agreement and sought to renegotiate it. When American Residential resisted, Erik Workman, Mack's Vice President of Sales and Marketing, told Christopher Byce, formerly Senior Vice President of Investments of American Residential's prior parent company, that "the Debtor would transfer its assets to related entities for nothing in return to hinder American Residential's ability to exercise its legal remedies as a creditor." Amended Complaint, ¶ 30. By September 2014, Mack had stopped making payments under the Agreement. Amended Complaint ¶ 34. In December 2014, Mack sent American Residential a proposed revised contract that Mack said was, essentially, not negotiable. American Residential refused to change the Agreement.

Even before Workman made his threat about dissipating assets, Mack began to "prepare for a possible breakdown in the business relationship." Amended Complaint ¶ 39. "In the months leading up to and during the negotiations with American Residential, the debtor had already begun dissipating its assets." ¶ 40. Before 2013, the McClellands, who own Mack and many related entities, ran almost the entire real estate business in Mack's name. Amended

Complaint ¶ 41.  In 2013, the McClellands began to "create new entities and to divert business opportunities and assets from the Debtor to those entities."  Amended Complaint ¶ 42.  They created at least 15 new entities in 2013, at least four new entities in 2014, at least six new entities in 2015, and at least two new entities in 2016.  Amended Complaint ¶ 43.  Mack owned five of these entities:  Mack Industries II LLC, Mack Industries III LLC, Mack Industries IV LLC, Mack Industries V LLC, and Mack Industries VI LLC.  Amended Complaint ¶ 44.  All the other new entities were owned by James K McClelland, James H. McClelland (James K. McClelland's son), or both.  Amended Complaint ¶ 45.

    Although Mack owned some real estate after 2013, "the vast majority of real estate acquired for flipping was acquired by the new entities."  Amended Complaint ¶ 47.  Mack also transferred real estate from itself to the new entities.  Amended Complaint ¶¶ 47, 48.  The McClellands thereby reduced the assets "that the debtor had that could be collected by American Residential."  Amended Complaint ¶ 48.  Mack also "drew down" on its own assets to benefit the other entities.  Amended Complaint ¶ 49.  It paid contractors to work on and improve real property owned by the other entities, and paid bank loans incurred by the other entities. Complaint ¶50.  The McClellands also "extracted" at least $10.7 million in cash from Mack and other entities.  Amended Complaint ¶ 52.  Mack concealed its dissipation from American Residential.  After June 2014, it failed to provide American Residential with Quarterly Statements required under the Agreement detailing its income.  Amended Complaint ¶¶ 54, 55. American Residential tried to take over its own properties in 2016 but Mack refused to provide

information about the subtenants. Amended Complaint ¶ 58. In March 2016, American Residential sued Mack and related entities in state court. Amended Complaint ¶ 37.

2. <u>Constructive Fraud</u>

TTS argues that the claim in Count I based on constructive fraud must be dismissed because the trustee has failed to allege an essential element of his claim: that Mack did not receive reasonably equivalent value for the payments. TTS asserts, and the trustee does not contest, that the complaint and attachments show that Mack ordered the granite and that TTS fabricated and installed it in accordance with Mack's directions. TTS therefore contends that Mack received reasonably equivalent value for the payments. It agues that what Mack chose to do with the goods and services does not affect the objective value it gave Mack in exchange for the money. The trustee responds that *Mack* did not receive any value because the granite was installed in properties that Mack did not own. TTS is correct. Mack received reasonably equivalent value for its payments to TTS.

The trustee brings his constructive fraud claim under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5(a)(2), 6(a), and 8(a), via § 544(b)(1) of the Bankruptcy Code, as well as under § 548(a)(1)(B) of the Bankruptcy Code. A plaintiff seeking to avoid a fraudulent transfer based on constructive fraud under § 548(a)(1)(B) must plead and prove the following: (1) a transfer of the debtor's property or interest; (2) made within two years before the date the bankruptcy petition was filed; (3) for which the debtor received less than a reasonably equivalent value in return; and (4) that the debtor (a) was insolvent on the date of the transfer or became insolvent as a result, (b) engaged in business or a transaction as a result of which the debtor's

5

remaining capital was unreasonably small, or (c) intended to incur, or should have known he would incur, debts he would be unable to pay. *KHI Liquidation Trust v. C. Goshy Enterprises, Inc. (In re Kimball Hill, Inc.)*, No. 10-ap-998, 2012 WL 5880657, at *5 (Bankr. N.D. Ill. Nov. 19, 2012); *Cox v. Grube (In re Grube)*, No. 09-ap-8111, 2012 WL 3263905, at *4 (Bankr. C.D. Ill. Aug. 9, 2012); *Martino v. Edison Worldwide Capital (In re Randy),* 189 B.R. 425, 440 (Bankr. N.D. Ill. 1995).  Under the IUFTA, the elements are the same but the statute of limitations is four years. 740 ILCS 160/5, 160/10; *Reinbold v. Morton Community Bank (In re Mid-Illini Hardwoods, LLC*), 576 B.R. 598, 604 (Bankr. C.D. Ill 2017)*; see Zimmerman v. Paulsen*, 524 F. Supp. 2d 1077 (N.D. Ill. 2007).

The standard for reasonably equivalent value is the same under Illinois law and § 548(a). *Baldi v. Samuel Son & Co, Ltd.,* 548 F.3d 579, 580 (7th Cir. 2008); *Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer (In re Jumer's Castle Lodge Inc.)*, 472 F.3d 943, 947 (7th Cir. 2007) ("Because the IUFTA is a uniform act, we may look to cases decided under 11 U.S.C. § 548, as well as cases interpreting other states' versions of the [UFTA] to determine the meaning of the phrase 'reasonably equivalent value.'"). [1]

Determining whether a debtor received reasonably equivalent value for the transfer involves a three-part inquiry:  (1) did the debtor receive some value, (2) was the value received in exchange for the transfer by the debtor, and (3) did the value received by the debtor have a reasonable equivalence to what the debtor transferred. *Mid-Illini Hardwoods*, 576 B.R. at 604. Here, the trustee does not dispute that Mack ordered the goods and services and paid a

---

[1] TTS argues, and the trustee concedes, that all but one transaction alleged in the complaint is barred by the two year limitations period for claims under § 548(a).

reasonable price for them, so the second and third inquiries are not contested. The parties dispute whether the facts alleged can establish that *Mack* received value when TTS fabricated and installed granite at the direction of Mack in properties owned by third parties.

The focus of the inquiry regarding reasonably equivalent value "must be on the specific transaction the trustee seeks to avoid, *i.e.*, the *quid pro quo* exchange between the debtor and the transferee, rather than an analysis of the transaction's overall value to a debtor as it relates to the welfare of the debtor's business." *Balaber-Strauss v. Sixty-Fve Brokers (In re Churchill Mort. Inv. Corp.),* 256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000). Courts seek to ensure that there is an exchange of property that is a fair equivalent and "not disproportionately small as compared with the value of the property or obligation obtained." *Id.* Courts examine "the objective value of the goods and services provided rather than the impact the goods and services had on the bankrupt enterprise." *Trauner v Delta Air Lines, Inc. (In re Think Retail Solutions, LLC*), No.17-ap-5078, 2019 WL 2912717 at *16 (Bankr. N.D. Ga. 2019) (quoting *Orlick v. Kozyak (In re Financial Federated Title & Trust, Inc.)*, 872 F.3d 1235, 1248 (11th Cir. 2017) and *Merrill v. Allen (In re Universal Clearing House Co.*, 60 B.R. 985, 998-99 (D. Utah 1986)); *PSN Liquidating Trust v. Intelsat Corp (In re PSN USA, Inc.)*, 615 F. App'x 925, 932 (11th Cir. 2015) (the debtor may receive value even if the transfer increases its insolvency). "[U]nder § 548, in assessing the "value" of property, goods or services provided directly to the debtor, the question is not whether the debtor subjectively benefitted from the property it received; the operative question is whether the property, goods, or serviced provided had objective value." *McHenry v. Dillworth (In re Caribbean Fuels Am., Inc.)*, 688 F. App'x 890, 894-95 (11th Cir. 2017).

Courts determine the objective value as of the date of the transfers, not on a post-transfer basis that considers whether the purchase was wise or impacted the financial picture of the debtor. *Think Retail*, 2019 WL 2912717 at *16. "Courts will not look with hindsight at a transaction because such an approach could transform fraudulent conveyance law into an insurance policy for creditors." *Kipperman v. Onex Corp.*, 411 B.R. 805, 837 (N.D. Ga. 2009). This is true even when the transaction in question harmed creditors and diminished the debtor's bankruptcy estate. As the *Churchill Mort.* court noted, debtors often engage in "improvident purchases or expenditures which have a detrimental effect on creditors and may even be a precipitating cause of bankruptcy." *Id*. at 681. "The fact that transactions may 'exacerbate the harm to creditors and diminish the debtor's estate' from an overall perspective does not mean that the debtor received less than reasonably equivalent value in respect of each particular transaction." *Id.*

In *Churchill Mort. Inv. Corp.,* a trustee sought to avoid transfers made to various brokers who originated mortgages and solicited investors in a debtor that was operating a Ponzi scheme. The trustee alleged that the payments to the brokers were avoidable as fraudulent transfers based on actual and constructive fraud because the business generated by the brokers clothed the debtor's fraudulent enterprise in an aura of respectability and enabled the corrupt management to continue its scheme. The court held that each transaction must be evaluated based solely on the value given and received by the debtor. The debtor paid a reasonable amount for the services it received, so the court concluded that the debtor received reasonably equivalent value without considering how the services affected the debtor's ability to carry out its fraud.

The analysis regarding reasonably equivalent value does not change when a third party benefits from the transfer. In *Think Retail,* 2019 WL 2912717, the court held that a debtor received reasonably equivalent value from an airline when the debtor's principal purchased airline tickets for her personal use and the personal use of others. The debtor got reasonably equivalent value for the airline tickets because it controlled all the rights it purchased from the airline, including the right to a seat on a flight, the right to designate the name of the passenger for the ticket, the right to cancel the flight, and the right to modify the scheduled travel date and destination. The use of those rights by third parties did not negate the objective value given by the airline to the debtor.

In fact, even when a debtor pays the debt of another party, it may nevertheless receive reasonably equivalent value. Though the general rule is that a debtor does not receive reasonably equivalent value by paying the debt of a third party, courts still examine the facts and circumstances to determine whether the debtor indirectly got reasonably equivalent value, such as through multi-party transactions. *Mid-Illini Hardwoods,* 576 B.R. at 607.

Here, the trustee does not contend that Mack paid TTS more than the granite was worth or that Mack paid the debt of another party. Instead, the trustee argues that Mack received nothing even though TTS provided exactly what Mack paid for. In effect, the trustee seeks to make TTS pay, literally, for Mack's decisions regarding where to install the purchased granite. The trustee's argument fails.

As explained above, in determining whether Mack got reasonably equivalent value, the court must examine only the specific transactions at issue, not Mack's overall financial condition or any fraudulent scheme that Mack's management might have been perpetrating. It is

9

undisputed that TTS provided real value to Mack for the payments it received. Mack ordered the stonework and directed where it was installed. TTS performed the work as directed by Mack and was paid a reasonable amount for its work. Like the airline tickets purchased in *Think Retail*, Mack got what it paid for in each transaction: the right to have granite fabricated and installed as it directed. The fact that Mack may have used the granite to benefit others or that Mack may have been engaging in an overall scheme to rid itself of assets does not diminish the value TTS provided to Mack. Under the facts alleged in the amended complaint, TTS provided reasonably equivalent value so the transfers were not constructively fraudulent.

The trustee has failed to cite a single case in which an arms-length transaction between a debtor and a vendor in which a reasonable amount was paid for goods and services actually provided was avoided as constructively fraudulent based on what the debtor chose to do with those goods and services. Fraudulent conveyance law is grounded in equity and is designed to enable a trustee or creditors to avoid a transfer when the transferee received more from the debtor than the debtor received from the transferee. *Churchill Mort. Inv.,* 256 B.R. at 682. It is not designed to turn every vendor into an insurer to creditors against corporate malfeasance. Here, Mack got what it paid for; it received reasonably equivalent value.

The trustee has not pled facts that support the essential element of lack of reasonably equivalent value.[2] Nor will the trustee be able to amend to fix this defect; the premise of his

---

[2]TTS also argues that the facts alleged support the conclusion that Mack received reasonably equivalent value in any event when the granite was installed in properties owned by subsidiaries of the debtor. Value provided to a subsidiary can provide value to its parent. *See, e.g., Heritage Bank v. Steinberg (In re Grabill Corp.)*, 121 B.R. 983, 996 (Bankr. N.D. Ill. 1990); *Garrett v. Faulkner (In re Royal Crown Bottlers of N. Alabama, Inc.)*, 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982). This issue, however, raises factual questions that should not be resolved on a motion to dismiss.

claim is faulty. His claim in Count I based on constructive fraud will be dismissed with prejudice.

3. Actual Fraud

TTS also argues that the trustee failed to allege a plausible claim in Count II for fraudulent transfer based on actual fraud with the particularity required by Rule 9(b). As explained in *McClean*, the following standards apply to a motion to dismiss a fraud claim.

Rule 8(a) of the Federal Rules of Civil Procedure requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); Fed. R. Bankr. P. 8. A complaint must clear "two easy-to-clear hurdles" to satisfy Rule 8(a). *E.E.O.C. v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007). First, the complaint must contain enough information to give the defendant "fair notice" of the claim. *See Reger Dev't. LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir. 2019). The complaint need not make detailed factual allegations but there must be at least some facts supporting each element of the claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949-50 (2009). Second, the complaint must plausibly suggest that the plaintiff has a right to relief, raising that right above the speculative level. *Concentra*, 496 F.3d at 776. Satisfying this standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation . . . . A pleading that offers . . . a formulaic recitation of the elements of a cause of action will not do." *Id.* Put another way, "[t]hreadbare recitals of elements of cause of action, supported by mere conclusory statements, do not suffice." *Id.* Plaintiffs may not "merely parrot the statutory language of the claims they are pleading . . .

11

rather than providing some specific facts to ground those legal claims . . . ." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

When alleging fraud, however, Rule 9(b) requires more. A plaintiff must "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009. Particularity means "the who, what, when, where and how: the first paragraph of any newspaper story." *Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996). The particularity standard is "somewhat relaxed" for a bankruptcy trustee because he may lack information that the debtor would have. *See, e.g., In re Grube*, 500 B.R. 764, 776 (Bankr. C.D. Ill. 2013); *Marwil v. Oncale (In re Life Fund 5.1 LLC)*, No. 10-ap-42, 2010 WL 2650024 (Bankr. N.D. Ill. June 30, 2010). Nevertheless, the trustee must still comply with the "who, what, when, where and how test" of particularity. *See Life Fund 5.1*, 2010 WL 2650024 (fraudulent transfer claims filed by a trustee were dismissed for failure to plead the precise amount of the transfer, the date of the transfer, and the debtor from whose account the money was transferred).

Fraudulent intent may be shown through direct evidence or circumstantial evidence, often referred to as "badges of fraud." As explained in *Frierdich v Mottaz*, "[d]irect proof of actual intent to defraud is not required—indeed, it would be hard to come by—and a trustee can prove actual intent by circumstantial evidence." 294 F.3d 864, 869-70 (7th Cir. 2002). Courts often look to "badges of fraud" as circumstantial evidence. *Id*. These "badges" include: whether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the

transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became solvent at the time of the transfer. *Id*.

TTS argues that the actual fraud claim in Count II does not pass muster under these standards. It contends that the amended complaint contains only conclusory allegations about a fraudulent scheme to deplete Mack's assets and that there are no allegations connecting that general scheme to the transactions with TTS. It also argues that the facts alleged do not support the trustee's contention that payments to TTS were part of this fraudulent scheme because the transactions with TTS began at least as early as 2013, well before the alleged threat in June 2014. TTS further contends that the trustee's list of transactions attached to the complaint shows that the "vast majority" of the benefits of the transactions ultimately flowed to American Residential, the supposed victim, or Mack's subsidiaries and thus to Mack itself.

The trustee responds that he has not only alleged badges of fraud that provide circumstantial evidence of actual fraud, he has alleged an "actual admission" of Mack's fraudulent intent through the statement of Workman to Byce.

The trustee has stated a claim for actual fraud with particularity, but just barely. The lynchpin of his claim is the alleged threat by Workman to Byce that if American Residential did not renegotiate the Agreement, Mack "would transfer its assets to related entities for nothing in return to hinder American Residential's ability to exercise its legal remedies as a creditor or otherwise." Amended Complaint ¶ 30. The trustee has provided enough of the who, what, and when for this alleged statement to satisfy Rule 9(b).[3]

---

[3] The trustee also alleges another threat that Workman made to Byce - that Mack's "special relationships with local authorities in Cook County and surrounding areas would prevent American Residential from exercising management and control over its properties."

TTS argues that the trustee has failed to allege that Workman had authority to make that statement or act on it. The trustee counters that the court must make inferences in his favor on a motion to dismiss. The trustee is correct. The court must infer on a motion to dismiss that a vice president had the authority to make the alleged statement.

TTS also argues in reply that the alleged threat itself does not support what the trustee alleges in this case. Workman said Mack would transfer its assets to related entities. Here, Mack contracted with a legitimate business for valuable goods and services and then paid for them - it did not transfer assets directly to a related entity. Though the trustee did not have an opportunity to respond to this argument, he would undoubtedly say that Mack's purchase of goods that ultimately benefitted a different entity is close enough to what Workman threatened to support his claim. The court agrees, but only because it must make all reasonable inferences in favor of the trustee.

The trustee supported his allegation about the Workman threat with various other allegations regarding the scheme to defraud. These allegations, described above, include that (1) the McClellands began creating many new entities to conduct the kind of business Mack had previously conducted, (2) they transferred real property owned by Mack to these new entities for no consideration, (3) Mack "drew down" on its own assets to benefit the other entities, (4) Mack paid contractors to do work on properties owned by the other entities, (5) Mack paid the loans of

---

Amended Complaint ¶ 31. This alleged threat does not support the trustee's claim of actual fraud. First, it is not plausible that any owner of hundreds of properties would take this threat seriously. If anything, the implausibility of this alleged threat undermines the trustee's position that the other threat by Workman - that Mack's assets would be gutted - should be taken seriously. Second, in any event, this threat does not fit the trustee's theory that Mack intended to defraud by depleting its assets.

14

other entities, (6) Mack concealed all of these actions from American Residential by failing to provide the quarterly income statements required under the Agreement, and (7) the McClellands "extracted" at least $10.7 million in cash from Mack and the other entities.

Some of these allegations could fall within the various badges of fraud discussed above.[4] None is made with any particularity or specifically connects the transactions with TTS to the allegedly fraudulent scheme. But the allegations taken together, assuming they are true and making all reasonable inferences in favor of the trustee, are just enough to allege a plausible claim for actual fraud with sufficient particularity to survive a motion to dismiss.

TTS is correct that many of the transactions described in Attachment A to the amended complaint occurred before the Workman threat in June 2014. The trustee has alleged, however, that the efforts to deplete assets began before the Workman threat, and the court must assume this is true and make all reasonable inferences in favor of the trustee. TTS is also correct that many of the properties in which it installed granite were owned by Mack subsidiaries so Mack probably benefitted from those installations in any event. While these facts could potentially provide a good defense regarding those transfers, they do not negate the allegations of an overall scheme to defraud by depleting assets.

The facts alleged in the amended complaint are not compelling but they are just sufficient for the trustee to proceed with his claim based on actual fraud.

---

[4]The allegations about the creation of new entities to hold newly purchased properties does not necessarily demonstrate a fraudulent intent, since the use of separate entities to hold different real properties is a widespread, legitimate business practice.

15

4. Conclusion

The motion to dismiss the claim in Count I for fraudulent transfer based on constructive fraud will be granted. The claim will be dismissed with prejudice.

The motion to dismiss the claim in Count II for fraudulent transfer based on actual fraud will be denied.

Dated: November 10, 2020

ENTERED:

_____
Carol A. Doyle
United States Bankruptcy Judge